IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: : | |
| **AMY L. STYER a/k/a AMY LOU STYER** : | **Bankruptcy No. 08-21348** |
| **Debtor** : | **Chapter 7** |
| **COMMONWEALTH OF PENNSYLVANIA** : | |
| **Acting by Attorney General** : | **Adversary Proceeding** |
| **THOMAS W. CORBETT, JR.** : | **Number: 08-2096** |
| **Plaintiff** : | |
| v. : | |
| : | |
| **AMY L. STYER a/k/a AMY LOU STYER** : | |
| **Defendant** : | |

### MOTION OF THE COMMONWEALTH OF PENNSYLVANIA
### FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, the Commonwealth of Pennsylvania, acting by Attorney General Linda L. Kelly, through the Bureau of Consumer Protection (herein referred to as the "Commonwealth" and/or "Plaintiff") hereby moves this Honorable Court for summary judgment in its favor and against the Debtor/Defendant, Amy L. Styer a/k/a Amy Lou Styer (herein referred to as the "Debtor", "Defendant" and/or "Styer"), with regards to the Commonwealth's Complaint to Determine the Dischargeability of Debts of the Debtor, and in support of which it represents as follows:

1. This is a core proceeding over which this Court has jurisdiction under 28 U.S.C. § 157 (b)(2)(I) regarding determinations as to the dischargeability of particular debts.

2. On May 22, 2008, prior to the Debtor's filing the Voluntary Petition initiating the above captioned Bankruptcy Case, the Commonwealth initiated an action by a Complaint in Equity in the Court of Common Pleas of Berks County (herein referred to as the "State Court") against various defendants, including Debtor/Defendant Styer, in the case *Commonwealth of*

*Pennsylvania v. Wesley Alvin Snyder, Sydney Snyder, Jacquelyn Herford-Rennie, Julie Ann Musser, Susan Louise Hunt, Kenneth Roger Bennetch, Cheryl Ann Bennetch, Amy Lou Styer and Alicia Mary Waid*, No. 08-6540 (herein referred to as the "State Court Action"). On or about September 14, 2009, the Commonwealth filed an Amended Complaint in Equity in the State Court Action, which was attached to and incorporated into the Commonwealth's Complaint to Determine Dischargeability in this adversary proceeding.

3. Contemporaneous with the filing of the Complaint in Equity in the State Court Action, the Commonwealth also filed a Motion for Preliminary Injunction, Accounting and Asset Freeze against all defendants except Wesley Snyder and Sydney Snyder, whose assets were covered under a plea agreement with the U.S. Attorney's Office.

4. On June 26, 2008, Styer filed this Chapter 7 proceeding.

5. Styer entered into a Stipulation for Agreed Preliminary Injunction on or about August 28, 2008 in the State Court Action.

6. The Commonwealth filed a Complaint to Determine the Dischargeability of Debts of the Debtor in the above captioned adversary proceeding on October 2, 2008. (Adversary Proceeding Docket No. 1).

7. On November 3, 2008, Defendant filed a Motion to Dismiss Pursuant to F.R.C.P. 12(b)(6). (Adversary Proceeding Docket No. 7).

8. By Order with accompanying Statement of Reasons in Support of the Order dated May 18, 2009, Defendant's Motion to Dismiss was denied, with this Court finding that the Commonwealth's Complaint stated a claim under 11 U.S.C. § 523(a)(2) upon which relief might

be granted and stated a claim under 11 U.S.C. § 523(a)(7) upon which relief may be granted. (Adversary Proceeding Docket Nos. 17 and 18).

9. On June 8, 2009, Styer filed an Answer to the Commonwealth's Complaint to Determine the Dischargeability of Debts of the Debtor. (Adversary Proceeding Docket No. 21).

10. By Order dated January 15, 2010, this Court ordered that the above-captioned adversary proceeding be stayed, deferred, and continued until the related State Court Action had been fully adjudicated and concluded in the Berks County Court of Common Pleas. (Adversary Proceeding Docket No. 46).

11. After a non-jury trial of the State Court Action, the State Court entered its Decision dated December 8, 2011 (herein referred to as the "Decision"), and entered an Adjudication and Final Decree dated December 9, 2011 (herein referred to as the "Adjudication"). The Decision and Adjudication were docketed and filed in the State Court on December 9, 2011. A copy of the Decision is attached hereto and incorporated herein as Exhibit "A", and a copy of the Adjudication is attached hereto and incorporated herein as Exhibit "B". No appeals have been filed with regards to the Decision and Adjudication.

12. The State Court found that "…we conclude that the Commonwealth has established that such conduct by the Mortgage Consultants not only had a tendency or capacity to deceive consumers, but did exactly that." See State Court Decision at page 40. Debtor/Defendant Styer is referred to in the Decision of the State Court as one of the five "Mortgage Consultants". See the Decision at page 6.

13. In its Decision, the State Court also stated as follows:

"Upon reviewing the 4,843 pages of testimony that was presented during both the preliminary injunction and permanent injunction phases of this case from the 109 witnesses that were called to testify by both the Commonwealth and the Defendants, as well as reviewing all 129 exhibits admitted into evidence, **we are of the opinion that the**

3

> **violation alleged by the Commonwealth that most certainly applies to this case is the one which appears at Section 201-2(4)(xxi) and that provides in pertinent in part as follows:**
>
> **Engaging in any ... deceptive conduct** which creates the likelihood of confusion or of misunderstanding. [Footnote 25]." (Emphasis added).
>
>> "[Footnote 25] – The Commonwealth contends that the evidence establishes not only deceptive conduct on the part of the five Mortgage Consultants and Cheryl Ann Bennetch, but also fraudulent conduct.
>>
>> Although we are not convinced, and, therefore, do not necessarily believe that the evidence warrants any finding of fraudulent conduct, **we need not reach that issue**, given our ultimate conclusion relative to the Commonwealth's claim of deceptive conduct." (Emphasis added).

See the Decision at pages 28 and 29, including footnote 25.

14. The Adjudication of the State Court held as follows:

"12.    Judgment is hereby entered against Defendant, Any Lou Styer, individually, for restitution pursuant to §201-4.1 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law in the amount of One Hundred Twenty-seven Thousand Six Hundred Ninety-Seven and 45/100 Dollars ($127,697.45), for the benefit of the specific consumers listed in the Restitution Chart as to wrap mortgages sold by Defendant Amy Lou Styer included separately within Commonwealth Exhibit No. 121, which is attached hereto and incorporated herein as Attachment 'A'. Defendants Wesley Alvin Snyder and Sydney Snyder are also held jointly and severally liable for such restitution."

See Adjudication at pages 7 and 8, section C, paragraph 12.[i]

15.    Since the State Court stated that it did not need to reach the issue of fraudulent conduct since it found deceptive conduct under Section 201-2(4)(xxi) of the Consumer Protection Law, 73 P.S. § 201-2(4)(xxi) (See Decision at footnote 25, page 29), this Court should consider the testimony and exhibits entered into evidence during the preliminary injunction and permanent injunction phases of the State Court Action. Such evidence proves that the conduct of

---

[i] The Commonwealth intends to file with the State Court a Motion to Correct the Amount of Certain Judgments for Restitution including the judgment for restitution pursuant to Section 201-4.1 of the Consumer Protection Law imposed by the State Court against Defendant Styer, which correction relates to the reduction of the amount of net restitution for certain consumers based on net settlement amounts received from third parties (as referenced in footnote 37 at page 53 of the State Court Decision).

4

Styer, constituted obtaining money, property, services or an extension, renewal, or refinancing of credit by false pretenses, a false representation, or actual fraud, and therefore, the restitution awarded against Styer is not dischargeable pursuant to 11 U.S.C. § 523(a)(2). The following is supported by testimony and exhibits submitted during the State Court Action. The endnotes cite to some of the testimony and exhibits submitted during the State Court Action which include parts of the Record of the State Court Action. Only certain parts of the Record of the State Court Action are attached hereto and incorporated herein as Exhibit "C".

    a.    Defendant Styer began working for the Snyder Corporations in September, 1991, and was employed there until September, 2007.[1]

    b.    Defendant Styer's husband, Larry Styer, was also an employee of the Snyder Corporations from November, 2001 until spring of 2005.[2] Within the first year that Larry Styer was employed by the Snyder Corporations, toward the end of 2002, he told Wesley Snyder that the program they were using was not working and was not making any money. However, Snyder did not want to hear it.[3] Larry Styer was also involved in investing funds which he believed were company profits and Wesley Snyder's personal funds. However, Larry Styer was not happy with the results and gave up on it.[4] Larry Styer left the employ of the Snyder Corporations in spring of 2005, because he was unhappy with his performance and because he was not feeling well.[5]

    c.    Defendant Styer was aware that her husband Larry Styer worked in investments with the Snyder Corporations from September 2001 to spring of 2005, and that Larry was to do research on an investment program and run models on that program.[6] During the period from September 2001 to spring of 2005, while Larry Styer worked for the Snyder Corporations, meetings were also held with Wesley Snyder, Defendant Amy Styer, Larry Styer and another

5

employee, Dan Bergey. At these meetings, the four would discuss the projects they were working on, including the strategy for investing. These meetings also included discussions as to how the companies were doing, including that, other than a $28,000.00 profit in 2005, there were no profits in any other year while Larry Styer worked for the Snyder Corporations.[7] At a minimum during the period from September, 2001 to spring of 2005, Defendant, Amy Styer was aware that no profits were being made from the minimal investing that was being done.

    d.    From 1994 through August, 2008, Defendant Styer held a Series 6 and Series 63 License under the Financial Industry Regulatory Authority ("FINRA"). As a Series 6 license holder, Styer was required to consider the suitability of various investments for her clients before she sold them.[8]

    e.    Most consumers to whom Defendant Styer sold Wrap Mortgages did not have any expertise in the mortgage or financing industries.[9] Defendant Styer would have an initial meeting with the consumers at which point she would tell them that, in order to get the lower rate, they would have to enter into a Wrap Mortgage. She would also tell the consumers that they would have to borrow an amount in addition to what they needed to refinance or buy the house, with that additional amount of money borrowed, being the Wrap Monies, being turned over to Image Masters.[10]

    f.    Defendant Styer was aware while she worked for the Snyder Corporations that neither the Wrap Mortgages nor the Loan Participation Agreements were being recorded in the County Recorder of Deeds office. Styer's testimony that she learned at a staff meeting that sometime in the past Wrap Mortgages were recorded is not credible.[11] At least prior to 2000, Styer would typically set up the Institutional Mortgage for thirty (30) years for a consumer, but set up the Wrap Mortgage for that consumer as twenty-five (25) years.[12] In that situation, the

consumer would be in a situation where they would completely pay off the Wrap Mortgage and then still be responsible to pay the remainder on the Institutional Mortgage for the remaining five (5) years. However, Styer would not sufficiently explain that to the consumers.[13]

g. Defendant Styer misled consumers to believe that they had to pay the Wrap Monies over, so that Image Masters could use it in some capacity and then give the consumer a lower interest rate and flexibility on the mortgage. Styer would also tell consumers that the portion of the Wrap Monies that was not used to pay the Institutional Mortgage would remain there so they could borrow it in the future. If the consumer asked in what capacity the Wrap Monies were going to be used, Styer would tell them it was used for swing loans for other people and Snyder would make a return on those loans.[14] Styer would also tell certain consumers that the money involved in the Wrap Mortgages was invested by Wesley Snyder which allowed the company to offer clients the lower rates.[15]

h. Styer would indicate to consumers that the Wrap Monies were being used to obtain a return so Image Masters could give them the lower interest rate, and that Image Masters had use of that money and was responsible for it. Styer would also indicate to consumers that it was safe because the company had been doing this for a long time and never lost money.[16]

i. It was Styer who determined the amount of Wrap Monies which the consumer would have to borrow from the Institutional Mortgage Lender and pay over to Image Masters.[17] Styer would tell the consumer how much the Wrap Monies had to be in order to get a certain percentage rate for the interest.[18] Styer would give certain consumers the Brochure,[19] and would give certain consumers the History of OPFM form to sell Wrap Mortgages.[20] Styer would take the mortgage application for the Institutional Mortgage for the consumer, and would typically choose the Institutional Mortgage lender which would be used in the Wrap Mortgage for the

7

consumer. Styer believed it was her responsibility to find the best possible rate for the consumer on the Institutional Mortgage.[21]

j. Styer did not suggest to the consumer that he or she should consider entering into a conventional mortgage or some other product, as opposed to the Wrap Mortgage program, if the consumer stated they wanted the low rate advertised.[22] Styer would only suggest to consumers that they have the Wrap Mortgage documents reviewed by someone else if Styer felt that she could not answer questions the consumer asked.[23] Styer would not give the consumers copies or drafts of the Wrap Mortgage Documents prior to the Second Closing unless the consumers specifically asked for them.[24] At the Wrap Mortgage closing, Styer did not go over the Wrap Mortgage, Wrap Mortgage Note or any other document executed by the consumer at the Wrap Mortgage closing on a paragraph by paragraph basis.[25] Styer did not point out or sufficiently explain to the consumer the paragraph of the Wrap Mortgage which stated that the Institutional Mortgage would still remain in effect.[26]

k. Styer either did not explain sufficiently or did not explain at all to consumers that the Institutional Mortgage was still going to be the consumers' responsibility.[27] Consumer Robert Davis testified that he was not even aware that he entered into a Wrap Mortgage because he told Styer that he did not want to do that.[28] Mr. Davis believed he had a flat rate 30-year mortgage and made prepayments to pay it off early, including a $5,000.00 prepayment in August, 2007. In September, 2007, he received the Bankruptcy Letter dated September 14, 2007, and found out that he owed the full amount of the mortgage to an Institutional Mortgage lender and that none of the extra payments he made were credited on what the Institutional Mortgage lender was claiming he owed. Up until when he received the Bankruptcy Letter, Mr. Davis had no idea that he had any obligation to the Institutional Mortgage lender.[29] Styer did not

8

sufficiently disclose or explain to Mr. Davis that there was another Institutional Mortgage lender to whom he was responsible, and did not disclose that the prepayments would not reduce that obligation to the Institutional Mortgage lender.[30] Mr. Davis testified that, if he had known that this was the way the mortgage was going to work and that the extra payments were not being passed on to reduce the actual mortgage, he would not have entered into the Wrap Mortgage.[31]

l.    Consumer Michael DeFeo paid off to a zero balance the Image Masters Wrap Mortgage in August, 2007, and then received a call from the Institutional Mortgage lender stating there was a missed payment.[32] The OPFM Bankruptcy Letter was sent out on or around September 14, 2007.

m.    Styer did not point out or sufficiently explain to consumers paragraphs 21 or 27 of the Wrap Mortgage.[33] Defendant Styer did not explain to the consumers that the Wrap Monies were not going to be immediately turned over to the Institutional Mortgage lender at the time they paid it to Image Masters.[34] Styer did not tell consumers that if they prepaid or made extra payments and paid off the Wrap Mortgage early that the consumer would be responsible for the Institutional Mortgage loan for the entire term of the Institutional Mortgage.[35] Styer led certain consumers to believe that after the closing on the Wrap Mortgage the consumer would not be responsible for the Institutional Mortgage and that the consumer would only be responsible for the Wrap Mortgage with Imager Masters.[36] Styer also did not tell consumers that any prepayments or extra payments made by the consumers to Image Masters would not be passed on to the Institutional Mortgage Lender.[37] The consumer would receive a monthly statement from Image Masters indicating that the principal of his or her Wrap Mortgage was being reduced by the extra payments, but did not receive anything to indicate that the principal on the Institutional Mortgage was not being reduced.[38]

9

n.  Styer misrepresented to consumers that the consumers were actually receiving "new loans" and/or misrepresented to consumers that the Institutional Mortgage loan was being "assumed" by Image Masters and that the consumers would no longer be responsible for the Institutional Mortgage loan. Styer would tell consumers that the Institutional loan was going away. Defendant Styer used the Image Masters Settlement Statement at the Second Closing, misleading consumers to believe the entire Institutional Mortgage Loan was being assumed by Image Masters. Styer either failed to explain or failed to sufficiently explain to consumers that they were still going to be responsible for the Institutional Mortgage.[39]

o.  Styer did not explain to the consumer that there were no documents under which the Institutional Mortgage lender gave up any rights they had against the consumer.[40] Styer misrepresented to consumers or led consumers to believe that the Institutional Loan was being "assumed" by Image Masters or that the consumers would no longer be responsible for the Institutional Loan. Some consumers were not even aware that the Institutional Mortgage continued to be there.[41] Consumer Russell Smith testified that he received a call from the Institutional Mortgage lender seeing if he wanted to refinance his mortgage with them. When Mr. Smith stated he did not have a mortgage with the Institutional Mortgage lender, that lender told him he did and stated that the amount he owed was much higher than the amount Mr. Smith owed on the Wrap Mortgage. Mr. Smith testified that when he questioned Styer about the Institutional Mortgage lender's claims, Styer told him that he did not owe the Institutional Mortgage lender any money and that Mr. Smith owed Image Masters the amount shown on the Image Masters' Wrap Mortgage schedules.[42]

p.  Styer had consumers sign the misleading and confusing Subrogation Agreement without sufficiently explaining to consumers why they had to sign it or what the Agreement

was.[43] Styer also had consumers sign the Change of Address form at the Wrap Mortgage closing.[44] Styer did not disclose to the consumers that the Wrap Mortgage would not be recorded in the County Recorder of Deeds office.[45] Styer did not disclose to consumers that she would receive a commission on the amount of the Wrap Monies they paid to Image Masters and did not disclose that she would receive a commission on any pre-payments or extra payments the consumer made to Image Masters on the Wrap Mortgage.[46]

q. Styer sold consumers Barry and Linda Diem a Wrap Mortgage and failed to sufficiently explain it, to the extent that Mrs. Diem did not understand that she had a Wrap Mortgage.[47] Mrs. Diem paid extra amounts on her Wrap Mortgage, including a $10,000.00 inheritance she received from her mother, which Styer told her would reduce the principal. It was not until after Mrs. Diem received the Bankruptcy Letter from Image Masters in September, 2007, that she realized that the amount she paid up front to Image Masters and the extra payments she made, including the inheritance, did not reduce the principal on the Institutional Mortgage.[48]

r. Styer was aware that calls were coming in from upset consumers.[49] Styer was aware that there were cash flow problems particularly since Wesley Snyder asked her to loan him $30,000.00 in May or June of 2007, but she claims never to have asked Snyder what the cash flow problem was.[50] However, Styer conducted the Wrap Mortgage closing for consumers Bell in July, 2007, and accepted Wrap Monies from him in the amount of $28,109.64 (Wrap Note number 2007048; Wrap Mortgage closing date July, 2007; Amount Prepaid $28,109.64).[51]

s. Styer was fully aware that if Image Masters or OPFM failed to pay the Institutional Mortgage lender, then the consumer would still be responsible for paying the Institutional Mortgage.[52] However, Styer did not disclose to her clients what would happen if

11

the company went bankrupt.[53] Styer failed to disclose to consumers the significant risks and disadvantages to consumers in entering into the Wrap Mortgage and did not disclose the potential problems that might come up with the Wrap Mortgage.[54] Styer did not contact the consumers to whom she sold Wrap Mortgages, to tell them that Image Masters and OPFM were having cash flow problems or financial difficulties.[55] Styer did not disclose to the consumers that if Image Masters and OPFM went bankrupt, the consumers would lose the Wrap Monies they had paid to Image Masters. Defendant did not disclose to the consumers that if Image Masters and OPFM went bankrupt, the consumer would be required to pay the full outstanding amount of the Institutional Mortgage.[56]

t.  Consumers relied on the representations made to them and the explanations given to them by Styer in making their decision to pay the Wrap Monies to Image Masters.[57] Consumers trusted Styer and relied on the representations made to them and the explanations given to them by Styer, regarding the Wrap Mortgage Program in making their decision to enter into a Wrap Mortgage with Image Masters.[58] Consumers only became aware that there was a problem with their Wrap Mortgages when they were contacted by the Institutional Mortgage lender and informed that the Institutional Mortgage was not being paid and/or when they received a letter from Image Masters dated September 14, 2007, which notified them that they were responsible to pay the Institutional Mortgage. That was the first time that most of the consumers became aware that there was any problem or that they were responsible for the Institutional Mortgage.[59]

u.  If Styer had disclosed to consumers that there was a risk that they could lose the Wrap Monies paid to Image Masters if Image Masters filed for bankruptcy, the consumers would not have entered into a Wrap Mortgage.[60] If Styer had disclosed to consumers that there was a

risk that the consumers would still be responsible to pay the Institutional Mortgage if Image Masters failed to do so, the consumers would not have entered into a Wrap Mortgage.[61]

v.     Styer was aware that every month consumers would make a monthly payment to Image Masters, and Image Masters would take that money, add an amount of money to cover the shortfall between what the consumer was paying Image Masters and what Image Masters had to pay the Institutional Mortgage lender, and forward the amount due on the Institutional Mortgage to the Institutional lender.[62] However, Styer never asked Wesley Snyder how he was able to make up that difference.[63] Styer knew or should have known that the Wrap Mortgage Program could not succeed given the high rate of return that would have been necessary to make up the shortfall, but she still sold the Wrap Mortgages to her clients.

16.    Although the State Court stated that it did not need to reach the issue of fraudulent conduct, the testimony and exhibits, which were entered into evidence and which became part of the record of the State Court Action, along with the Decision and Adjudication, establish that there is no genuine dispute as to any material fact related to the nondischargeability issues pending before this Court and the Commonwealth is entitled to judgment as a matter of law.

17.    The grounds for the relief requested in the Commonwealth's Motion for Summary Judgment are fully set forth in the Commonwealth's Memorandum of Law in support of this Motion, which is being filed contemporaneously herewith and which is incorporated herein by reference in its entirety.

**WHEREFORE,** based on the Decision and Adjudication of the State Court, and the testimony and exhibits entered into evidence in the State Court Action, the Commonwealth of Pennsylvania respectfully requests this Honorable Court to enter summary judgment in its favor and against Debtor/Defendant Styer, grant the Commonwealth's Motion, declare that any and all

restitution debts owed by Debtor/Defendant Styer pursuant to Section 201-4.1 of the Pennsylvania *Unfair Trade Practices and Consumer Protection Law*, 73 P.S. § 201-1, *et seq.* as determined by the Court of Common Pleas, Berks County, Pennsylvania, in the case of *Commonwealth of Pennsylvania v. Wesley Alvin Snyder, Sydney Snyder, Jacquelyn Herford-Rennie, Julie Ann Musser, Susan Louise Hunt, Kenneth Roger Bennetch, Cheryl Ann Bennetch, Amy Lou Styer and Alicia Mary Waid,* No. 08-6540, are excepted from discharge and are non-dischargeable in this and/or any future bankruptcy proceedings of Debtor Styer, pursuant to the Bankruptcy Code, including, 11 U.S.C. § 523(a)(2) and § 523(a)(7), and grant such other and further relief as the Court deems just and proper under the circumstances.

Respectfully Submitted,

COMMONWEALTH OF PENNSYLVANIA

LINDA L. KELLY
Attorney General

Date: 3-30-12

By: _____
Thomas J. Blessington
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
Bureau of Consumer Protection
21 South 12th Street, 2nd Floor
Philadelphia, PA 19107
(215) 560-2414
Attorney for Plaintiff,
Commonwealth of Pennsylvania

---

[1] Transcript page 2658 line 5 to page 2659 line 2.
[2] Transcript page 2656 lines 2 to 9; Larry Styer Deposition taken March 3, 2009 page 16 lines 20 to 25, page 19 lines 14 to 21, page 32 lines 14 to 18, page 48 lines 16 to 19; Commonwealth Exhibit 120.
[3] Larry Styer Deposition taken March 3, 2009 page 30 line 21 to page 31 line 25, page 38 line 24 to page 39 line 3; Commonwealth Exhibit 120.
[4] Larry Styer Deposition taken March 3, 2009 page 33 line 2 to page 36 line 8; Commonwealth Exhibit 120.
[5] Larry Styer Deposition dated March 3, 2009, page 48 line 16 to page 49 line 17; Commonwealth Exhibit 120.
[6] Transcript page 2755 lines 8 to 23.
[7] Larry Styer Deposition dated March 3, 2009, page 44 line 7 to page 45 line 6, page 45 line 16 to page 46 line 3, page 46 lines 4 to 14, page 49 line 18 to page 50 line 1, page 51 line 21 to 52 line 21; Commonwealth Exhibit 120.

[8] Transcript page 2656 lines 5 to 22; page 2657 line 10 to page 2658 line 4; Commonwealth Exhibit 129.
[9] Transcript page 2789 lines 10 to 24; page 2826 lines 10 to 17; page 2846 lines 21 to 24; page 2935 line 18 to page 2936 line 10; page 2951 lines 16 to 19; page 2966 line 14 to page 2967 line 4; page 2982 lines 15 to 19; page 2993 lines 11 to 19; page 3020 lines 6 to 12; page 3036 line 17 to page 3037 line 3; page 3055 line 22 to page 3056 line 12; page 3072 lines 13 to 20; page 3063 line 25 to page 3084 line 12.
[10] Transcript page 2659 line 22 to page 2660 line 16; page 2792 line 18 to page 2793 line 8; page 2827 lines 11 to 21; page 2848 line 1 to page 2849 line 22; page 3093 lines 15 to 23; page 2737 line 9 to page 2738 line 3; page 2743 lines 8 to 18; page 2968 line 22 to page 2969 line 16.
[11] Transcript page 2661 line 14 to page 2663 line 9.
[12] Transcript page 2738 lines 8 to 14.
[13] Transcript page 2768 lines 1 to 6.
[14] Transcript page 2740 line 25 to page 2742 line 13; page 3005 line 20 to page 3006 line 16; page 3047 lines 19 to 22.
[15] Transcript page 2790 line 19 to page 2791 line 2; page 2792 line 21 to page 2793 line 3; page 2793 lines 8 to 16; page 2848 line 15 to page 2849 line 16; page 2938 line 24 to page 2940 line 3; page 2942 lines 3 to 19; page 2969 line 17 to page 2970 line 9; page 2984 lines 12 to 16; page 3004 line 3 to page 3005 line 7; page 3021 lines 9 to 22; page 3022 lines 6 to 11; page 3025 lines 7 to 13; page 3038 lines 7 to 19; page 3040 lines 13 to 23; page 3085 line 6 to page 3086 line 7.
[16] Transcript page 2751 line 16 to page 2753 line 12.
[17] Transcript page 2940 line 23 to page 2941 line 7; page 2958 lines 2 to 7; page 2970 lines 10 to 15; page 3006 lines 18 to 21.
[18] Transcript page 2739 line 9 to page 2740 line 1.
[19] Transcript page 2796 lines 9 to 18; page 2828 lines 3 to 6; page 3022 lines 16 to 24.
[20] Transcript page 2761 lines 13 to 19; page 2763 line 10 to page 2764 line 20.
[21] Transcript page 2738 line 15 to page 2739 line 3.
[22] Transcript page 2795 lines 12 to 16; page 2827 lines 22 to 24; page 2983 line 25 to page 2984 line 4; page 3021 lines 23 to 25; page 3038 lines 20 to 22; page 3057 line 25 to page 3058 line 3; page 3086 lines 8 to 10.
[23] Transcript page 2742 line 17 to page 2743 line 8; page 2795 lines 17 to 20; page 2827 line 25 to page 2828 line 2; page 3022 lines 12 to 15; page 3038 lines 23 to 25; page 3086 line 11 to 14.
[24] Transcript page 2764 line 22 to page 2765 line 7.
[25] Transcript page 2804 lines 2 to 5; page 3009 lines 7 to 12.
[26] Transcript page 2824 lines 6 to 8.
[27] Transcript page 2809 line 23 to page 2810 line 1; page 2962 lines 11 to 14; page 2985 line 9 to page 2986 line 3; page 3061 line 24 to page 3062 line 11; page 3083 lines 18 to 24; page 3091 lines 19 to 22.
[28] Transcript page 2995 lines 3 to 14.
[29] Transcript page 2993 line 20 to page 2998 line 8; page 2998 line 20 to page 2999 line 13.
[30] Transcript page 2999 line 14 to page 3000 line 9.
[31] Transcript page 3000 line 10 to page 3001 line 3.
[32] Transcript page 3087 line 18 to page 3088 line 18.
[33] Transcript page 2770 lines 20 to 23.
[34] Transcript page 2750 lines 20 to 24.
[35] Transcript page 2768 lines 7 to 16; page 2804 line 6 to page 2805 line 5.
[36] Transcript page 2804 line 22 to page 2805 line 5.
[37] Transcript page 2977 lines 6 to 21; page 3012 lines 16 to 25; page 3049 lines 3 to 15; page 3067 lines 12 to 19; page 3078 lines 3 to 22.
[38] Transcript page 3078 line 3 to 3079 line 1
[39] Transcript page 2772 line 6 to page 2773 line 18; page 2820 lines 1 to 4; page 2823 lines 14 to 18; page 3008 lines 6 to 11; page 3009 line 13 to page 3010 line 17; page 3013 lines 1 to 4; page 3026 line 12 to page 3027 line 14; page 3075 line 16 to page 3076 line 12.
[40] Transcript page 2773 line 19 to page 2774 line 11.
[41] Transcript page 2945 line 23 to page 2946 line 5 and lines 21 to 24; page 2950 lines 5 to 10; page 2971 line 14 to page 2972 line 4.
[42] Transcript page 3076 line 24 to page 3077 line 15.
[43] Transcript page 2774 line 27 to page 2776 line 12; page 2988 line 13 to page 2989 line 4; page 3010 lines 18 to 24; page 3027 lines 15 to 25; page 3045 line 25 to page 3046 line 13; page 3090 lines 6 to 13.

---

[44] Transcript page 2778 line 13 to page 2779 line 1; page 2808 lines 5 to 14; page 2989 lines 5 to 12; page 3028 lines 1 to 3.

[45] Transcript page 2809 lines 11 to 14; page 2961 lines 14 to 17; page 2976 lines 21 to 24; page 2989 line 24 to page 2990 line 2; page 3012 lines 8 to 11; page 3029 lines 18 to 21; page 3048 lines 20 to 23; page 3066 lines 3 to 6; page 3077 lines 20 to 23; page 3091 lines 7 to 10.

[46] Transcript page 2809 lines 15 to 22; page 2961 lines 18 to 22; page 2976 line 25 to page 2977 line 6; page 2990 lines 3 to 13; page 3012 lines 12 to 15; page 3029 lines 22 to 25; page 3048 line 24 to page 3049 line 2; page 3077 line 24 to page 3078 line 2; page 3091 lines 11 to 18.

[47] Transcript page 2847 lines 14 to 22.

[48] Transcript page 2851 line 19 to page 2853 line 11.

[49] Transcript page 2785 line 24 to page 2786 line 23.

[50] Transcript page 2732 line 13 to page 2733 line 4; page 2786 line 24 to page 2787 line 3.

[51] Transcript page 2781 lines 5 to 25.

[52] Transcript page 2746 lines 16 to 20.

[53] Transcript page 2749 lines 6 to 9; page 2946 line 21 to page 2947 line 13; page 3044 lines 2 to 5 and lines 19 to 22; page 3045 lines 12 to 17.

[54] Transcript page 2742 lines 17 to 19; page 2797 lines 14 to 25; page 2810 lines 2 to 4; page 2828 lines 18 to 21; page 2962 lines 15 to 17; page 2971 lines 5 to 7; page 2977 line 22 to page 2978 line 3; page 2990 line 22 to page 2991 line 1; page 3007 lines 2 to 16; page 3030 lines 1 to 8; page 3048 lines 1 to 12; page 3066 line 14 to page 3067 line 1; page 3079 lines 2 to 5; page 3091 lines 23 to 25.

[55] Transcript page 2806 lines 21 to 24; page 2808 lines 22 to 24; page 2842 line 5 to 8; page 2877 lines 1 to 3; page 3028 lines 7 to 10; page 3047 lines 8 to 18; page 3077 line 16 to 19.

[56] Transcript page 2810 lines 5 to 12; page 2978 lines 4 to 11; page 2991 lines 2 to 10; page 3013 lines 5 to 8; page 3030 lines 9 to 16; page 3049 line 23 to page 3050 line 6; page 3092 lines 1 to 8.

[57] Transcript page 2798 lines 1 to 5; page 2823 line 25 to page 2824 line 5; page 2942 line 20 to page 2943 line 6; page 2986 lines 9 to 21; page 3008 line 24 to page 3009 line 2; page 3025 lines 14 to 18; page 3040 line 24 to page 3041 line 4; page 3079 lines 6 to 13; page 3089 line 13 to17.

[58] Transcript page 2798 lines 6 to 9; page 2972 lines 5 to 10; page 2990 line 24 to page 2991 line 1; page 3009 lines 3 to 6; page 3025 lines 19 to 21; page 3041 lines 5 to 10; page 3089 lines 18 to 20.

[59] Transcript page 2808 lines 16 to 21; page 2850 line 10 to page 2851 line 22; page 2941 line 18 to page 2942 line 2; page 2975 line 13 to page 2976 line 14; page 2989 lines 13 to 23; page 3011 lines 2 to 12; page 3028 lines 11 to 24; page 3045 lines 14 to 23; page 3048 lines 13 to 19.

[60] Transcript page 2810 lines 13 to 16; page 2947 lines 14 to 18; page 2962 lines 18 to 22; page 2978 lines 12 to 15; page 2991 lines 11 to 14; page 3013 lines 13 to 17; page 3030 line 22 to page 3031 line 1; page 3045 lines 5 to 11; page 3050 lines 7 to 10; page 3064 lines 10 to 15; page 3079 lines 14 to 18; page 3092 lines 9 to 13.

[61] Transcript page 2810 lines 17 to 21; page 2947 lines 19 to 23; page 2962 line 23 to page 2963 line 2; page 2978 lines 8 to 11 and lines 16 to 20; page 2991 lines 15 to 18; page 3013 lines 18 to 22; page 3030 lines 17 to 21; page 3044 line 19 to page 3045 line 4; page 3045 lines 18 to 23; page 3046 line 24 to page 3047 line 1; page 3050 lines 11 to 15; page 3063 line 18 to page 3064 line 9; page 3079 lines 19 to 23; page 3092 lines 14 to 18.

[62] Transcript page 2660 line 25 to page 2661 line 12.

[63] Transcript page 2782 line 24 to page 2784 line 2.