UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | |
|---|---|
| In re: AMY L. STYER, | : Chapter 7 |
| aka AMY LOU STYER, | : Case No. 08-21348REF |
|     Debtor | : |

-------------------------------------------------------------

| | |
|---|---|
| COMMONWEALTH OF | : |
| PENNSYLVANIA, | : |
|     Plaintiff | : |
|          v. | : Adv. No. 08-2096 |
| AMY L. STYER, | : |
| aka AMY LOU STYER, | : |
|     Defendant | : |

# MEMORANDUM  OPINION FINDING DEBT DISCHARGEABLE AND ENTERING JUDGMENT IN FAVOR OF DEFENDANT

## I.   INTRODUCTION

Defendant/Debtor, Amy Lou Styer ("Debtor") filed a Chapter 7 petition on June 26, 2008.  On October 2, 2008, Plaintiff, the Commonwealth of Pennsylvania (the "Commonwealth") filed this adversary complaint seeking to have its civil restitution claim against Debtor found nondischargeable.

The Commonwealth's claim against Debtor arises from a pre-petition lawsuit the Commonwealth filed against Debtor and several other defendants in the Berks County Court of Common Pleas (the "state court").  On January 15, 2010, I granted the Commonwealth's request that this adversary proceeding be held in abeyance pending the outcome of the state court action.  On December 12, 2010, the state court entered its decision finding that Debtor and the other defendants engaged in deceptive conduct under the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 et seq. ("Pa. Unfair Trade Practices Law").  The state court awarded civil restitution against Debtor in the amount of $127,697.46, which is the debt that the Commonwealth now seeks to have found nondischargeable.

The Commonwealth argues that the debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A) because the doctrine of collateral estoppel, also known as issue preclusion, applies to the state court's finding that Debtor engaged in conduct that had a tendency or capacity to deceive.  The Commonwealth's argument, however, is misplaced.  The issue before the state court did not require or include a finding that Debtor intended to deceive the consumers and was therefore not identical to the issue presently before me.

Debtor, on the other hand, argues that the doctrine of res judicata, also known as claim preclusion, bars the Commonwealth from relitigating their claim

2

that Debtor engaged in fraudulent conduct.  Debtor's argument is also erroneous.

Res judicata does not apply in dischargeability proceedings.[1]  Brown v. Felsen, 442

U.S. 127, 138-39 (1979); Cheripka v. Republic Ins. Co., No. 9103249, 1991 WL

276289, at *4 (3d Cir. Dec. 31, 1999).[2]

   Nonetheless, I find that the state court's finding that this Debtor's conduct

was neither willful nor intentional is entitled to collateral estoppel effect and

precludes the Commonwealth from arguing that Debtor acted with intent to

deceive when she sold the wrap mortgages to consumers.  Intent to deceive is a

critical element that the Commonwealth must prove to have the debt found

nondischargeable under Section 523(a)(2)(A).  I find and conclude, therefore, that

the Commonwealth failed to meet its burden of proof on this element.  Finally,

even if the Commonwealth were not estopped from relitigating the question

whether Debtor acted with intent to deceive, I find and conclude, based on the

evidence presented during the four-day trial held before me, that the

---

[1]    Collateral estoppel may, on the other hand, apply in dischargeability proceedings.
Grogan v. Garner, 498 U.S. 279, 285 (1991); Wolstein v. Docteroff (In re Docteroff), 133 F.3d
210, 214 (3d Cir. 1997); Cheripka, 1991 WL 276289, at *6; Viener v. Jacobs (In re Jacobs), 381
B.R. 128, 142 (Bankr. E.D. Pa. 2008).

[2]    In addition, the state court made no finding that Debtor engaged in fraudulent conduct.
To the contrary, the state court stated, "Although we are not convinced, and, therefore, do  not
necessarily believe, that the evidence warrants any finding of fraudulent conduct, we need not
reach that issue, given our ultimate conclusion relative to the Commonwealth's claim of
deceptive conduct."  Exhibit BK 50-A, State Court Decision entered on December 12, 2011 at
29, n.25.

Commonwealth failed to meet its burden of proving this crucial element. The debt is therefore dischargeable.

# II.  **BACKGROUND**[3]

Debtor started working for OPFM, Inc., trading as Personal Financial

Management ("OPFM")[4], in September 1991.   She remained employed there until

September 2007, which was about the time OPFM filed its Chapter 7 petition with

this court.   During the course of her employment, Debtor served as a mortgage

consultant and sold various financial services and products to consumers.   One of

the products sold by Debtor and the other mortgage consultants employed by

OPFM was known as a "wrap mortgage."   In addition, Wesley Snyder, the sole

shareholder of the OPFM companies, Debtor and at least one other mortgage

consultant employed by OPFM sold another product to consumers known as a

"loan participation agreement."

> The OPFM Companies publicly advertised the availability of
> wrap mortgages to consumers at interest rates that were always

---

[3]      The parties stipulated that I may consider as evidence certain of the factual findings made
by the state court. See Joint Pre-Trial Statement filed in this adversary proceeding on April 20,
2012 (docket entry 57), pp. 4 - 32. Much of the evidence presented during the trial before me
also addressed these matters.  I will refer to both the factual findings by the state court and my
independent factual findings (many of which are identical to those of the state court) throughout
this Memorandum Opinion.

[4]      OPFM is a Pennsylvania corporation owned and operated by Wesley Alan Snyder, who is
its president and sole shareholder.  OPFM and five other related corporations, all of which were
owned by Mr. Snyder as the sole shareholder, engaged in the business of providing mortgage and
investment brokerage and financial/investment counseling services to consumers.  I will refer to
these six corporations collectively as OPFM or the OPFM companies throughout this
Memorandum Opinion.  All six of the OPFM companies filed Chapter 7 bankruptcy petitions on
September 18, 2007 in this court.  The six cases are jointly administered at Case No. 07-
21587REF and remain pending because of ongoing litigation and negotiations between the
Chapter 7 Trustee and various financial institutions.

substantially lower than those being offered by OPFM's competitors. However, in order to obtain the discounted interest rate, consumers had to agree to participate in [OPFM's] "Equity Slide Down Wrap Mortgage Program," which obligated the consumer on the wrap mortgage to first obtain an institutional loan (or first mortgage from a bank) in an amount that was usually at least 20% in excess of what the consumer originally needed or intended to borrow, when they went into the OPFM office. That excess amount was and will continue to be referred to herein as the "wrap amount."

Exhibit BK 50-A, State Court Decision at 8-9 (emphasis in original).

The "Equity Slide Down Wrap Mortgage Program" involved two separate closings or settlements. The first closing was held on the institutional loan, which the consumer most often obtained from a commercial bank, but was arranged through OPFM, Inc. The mortgage executed in favor of the institutional lender was recorded with the county Recorder of Deeds office....

The second closing was held either immediately, or more commonly, within a few days after the first closing. A second set of documents, which included the wrap note and the wrap mortgage, were executed at this time in favor of Image Masters, Inc.[5] (footnote omitted). At the second closing, consumers were advised that the surplus money or wrap money which they had received from the institutional bank closing a few days earlier would be turned over to be invested by Wesley Alan Snyder in "conservative mutual funds," in return for which consumers would receive that discounted interest rate on their wrap mortgage.

Other documents which were also required to be signed by consumers at the second closing included a "Subrogation Agreement," which was represented to them as being a document that rendered the institutional bank mortgage which they signed at the first closings "subordinate" to the new wrap mortgage. The other document was a "Settlement Statement," indicating that the institutional loan was being "assumed" by Image Masters, Inc. Another was a "Change of Address" form, directing that all correspondence from the institutional

---

[5]     Image Master, Inc. was one of the six affiliated OPFM companies.

lender be sent directly to Image Masters, Inc., as opposed to the consumers who were in fact the borrowers. (footnote omitted).

Exhibit BK 50-A, State Court Decision at 11-13. The wrap mortgage was never recorded with the county Recorder of Deeds office.

Each consumer was instructed to pay the monthly wrap mortgage payment to OPFM. OPFM was supposed to then pay the consumer's monthly mortgage payment to the institutional lender. Because the amount of the monthly wrap mortgage payment was always less than each consumer's institutional monthly mortgage payment, OPFM was always required to add funds to the wrap mortgage payment it received from each consumer to pay the consumer's institutional mortgage payment.

At some point, OPFM was unable to make the mortgage payments owed to the institutional lender from the wrap mortgage payments it received from the consumers who were obligated on the corresponding institutional mortgage. OPFM then began using wrap mortgage payments it received from new consumers to pay the institutional mortgage payments owed by existing consumers.

> As the need for additional cash flow increased to pay off the institutional bank loans of existing consumers, and to maintain his "Ponzi scheme," Wesley Alvin Snyder developed an additional means to obtain funds by having consumers invest in allegedly secured loans that were known as "Loan Participation Agreements." The Loan Participation Agreements were executed directly with Image Masters, Inc. and were advertised and marketed to the general public as a safe

alternative to Certificates of Deposit issued by banks. Loan Participation Agreements were said to pay the consumer a rate of return which was substantially in excess of any interest being paid by banks, whether in the form of Certificates of Deposit or other investment vehicles.

Exhibit BK 50-A, State Court Decision at 14.


The OPFM companies were involved in selling wrap mortgages and loan

participation agreements in excess of twenty years.


In 2007, and coincident with the beginning of the financial meltdown in the U.S. economy, [the OPFM companies] began to experience severe cash flow problems and, consequently obvious difficulty in making timely payments to [the] first mortgage institutional lenders on behalf of their wrap mortgage consumers.

Exhibit BK 50-A, State Court decision at 4 – 5.


Over the five year period between September 19, 2002 and September 18, 2007, Image Masters, Inc. generated net losses totaling $10,726,371.00. And, Image Masters, Inc. had a negative net worth of $26,318.793.00 as of September 18, 2007, the date that the OPFM Companies filed for bankruptcy.

Exhibit BK 50-A, State Court Decision at 15.


The losses for all consumers who participated in the "Equity Slide Down Wrap Mortgage Program" were $26,028,157.88 and the losses for consumers who entered into Loan Participation Agreements was [sic] $2,647,573.44, for a grand total of $28,675,731.32. More than 700 consumers filed complaints with the Attorney General's office [of the Commonwealth of Pennsylvania] after the OPFM Companies filed for bankruptcy. (footnote omitted).

Exhibit BK 50-A, State Court Decision at 15-16.

On May 23, 2008, the Commonwealth commenced the state court action

against Wesley Snyder, his wife, Sydney Snyder, and certain employees of OPFM,

including Debtor. This action alleged that the defendants committed various

violations of the Pa. Unfair Trade Practices Law, and sought an award of

restitution, civil penalties, and costs as well as injunctive relief. Following a non-

jury trial, the state court entered its decision on December 9, 2011. The state court

found that Debtor and the other mortgage consultants engaged in deceptive

conduct and enjoined them "from receiving monies and/or payments for services,

as an employee or otherwise, pertaining to the provision of mortgage financing

and/or investment products ...." Exhibit BK 50-B, State Court Adjudication and

Final Decree at 3. The state court also enjoined Debtor "from entering into oral

and/or written contracts or agreements, as an employee or otherwise, to provide

mortgage financing and/or investment products ...." Id. at 4. These injunctions

expired earlier this year, on August 29, 2013.[6]

The state court also awarded the Commonwealth restitution against Wesley

and Sydney Snyder, Debtor, and the other mortgage consultants for the losses

sustained by the consumers in connection with the wrap mortgages. The state

court found Wesley and Sydney Snyder responsible for 95% of the losses

---

[6]    The state court also entered permanent injunctions against Debtor and the other mortgage
consultants enjoining them from engaging in any violation of the Pennsylvania Unfair Trade
Practices Law. Exhibit BK 50-B, State Court Adjudication and Final Decree at 5.

($23,578,732.38) and Debtor and the other mortgage consultants responsible for the remaining 5% of the losses ($1,240,985.91). The state court determined that the most equitable way to apportion the mortgage consultants' liability was to award restitution against each mortgage consultant in proportion to the annual percentage of wrap sale mortgage income that each mortgage consultant generated for the OPFM companies for the five year period running from 2003 through 2007. This resulted in restitution being awarded against Debtor in the amount of $127,697.46 for the benefit of the specific consumers listed in the Restitution Chart. See Exhibit BK 50-B, State Court Adjudication and Final Decree at 7, ¶12. This is the debt the Commonwealth now seeks to have declared nondischargeable.

Finally, the state court determined that restitution should not be awarded against Debtor for her role in selling the loan participation agreements because the Commonwealth failed to prove that Debtor engaged in deceptive conduct when she sold the loan participation agreements to consumers.[7] The state court also refused to impose civil penalties against Debtor and the other mortgage consultants finding that their conduct was neither willful nor intentional. Exhibit BK 50-A, State Court Decision at 48.

---

[7] The state court based this finding on the facts that: (1) Debtor and her husband, as well as many of their relatives, executed loan participation agreements and lost substantial amounts of their own money; and (2) most, if not all, of the other consumers who were identified as customers of Debtor had in fact executed their loan participation agreements with Wesley Snyder.

The Commonwealth maintains that the $127,697.46 state court restitution award entered against Debtor is nondischargeable under 11 U.S.C. §§523(a)(2)(A) and 523(a)(7). I entered an Order on August 27, 2012 granting judgment in favor of Debtor on the Commonwealth's claim that the debt was nondischargeable under Section 523(a)(7). I found that because the state court restitution award was for the benefit of certain consumers, as opposed to "to and for the benefit of a governmental unit, and not compensation for actual pecuniary loss" as that phrase is used in Section 523(a)(7), the debt was dischargeable under Section 523(a)(7). That left pending the Commonwealth's claim that the debt was nondischargeable under Section 523(a)(2)(A).

I conducted a four-day trial on the Commonwealth's Section 523(a)(2)(A) claim. The briefs have now been filed and the matter is ripe for disposition. This Memorandum Opinion sets forth my findings of fact and conclusions of law controlling this decision.

# III. DISCUSSION

## A. Dischargeability – General Standard and Burden of Proof.

The overriding purpose of the Bankruptcy Code is to grant honest debtors an opportunity to restructure their financial affairs and obtain a "fresh start," free of the weight of preexisting debt. Ins. Co. of North America v. Cohn (In re Cohn), 54 F.3d 1108, 1113 (3d Cir. 1995); Beard Research, Inc. v. Kates (In re Kates), 485 B.R. 86, 100 (Bankr. E.D. Pa. 2012); Int'l. Fid. Ins. Co. v. Marques (In re Marques), 358 B.R. 188, 193 (Bankr. E.D. Pa. 2006); Stevens v. Antonious (In re Antonious), 358 B.R. 172, 181 (Bankr. E.D. Pa. 2006). Exceptions to discharge are therefore strictly construed against creditors and liberally construed in favor of debtors. Id.

The Commonwealth contends that the restitution award entered against Debtor is nondischargeable under Section 523(a)(2)(A) because, the Commonwealth claims, Debtor induced consumers to participate in the wrap mortgage program with the use of false pretenses and misrepresentations. Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an

12

extension, renewal or refinancing of credit, to the extent obtained, by . . . false

pretenses, a false representation, or actual fraud, . . .." 11 U.S.C. §523(a)(2)(A).

To have debt found nondischargeable under Section 523(a)(2)(A), the

Commonwealth bears the burden of establishing by a preponderance of the

evidence that: (1) Debtor made a material misrepresentation; (2) knowing it was

false; (3) with the intent and purpose of deceiving the consumers; (4) the

consumers justifiably relied on Debtor's false representation; and (5) suffered a

loss or damage as a proximate consequence of the  false representation having been

made. Caro v. Jundi (In re Jundi), Adv. No.11-0759, Bankr. No. 11-14496, 2012

WL 3648013, at *4 (Bankr. E.D. Pa. Aug. 23, 2012); Del Casale v. McNamara (In

re McNamara), Adv. No. 07-0140, Bankr. No. 06-16108DWS, 2009 WL 2916977,

at *5 (Bankr. E.D. Pa. Feb. 24, 2009); Antonious, 358 B.R. at 182. Regardless

whether a creditor claims that the debtor made a false representation or used false

pretenses to induce the creditor to incur the debt, the creditor must prove that the

debtor acted with fraudulent intent to deceive the creditor for debt to be found

nondischargeable. Jundi, 2012 WL 3648013 at *4. In addition, "[a] false pretense

must be fostered 'willfully, knowingly, and by design; it is not the result of

inadvertence.'" Antonious, 358 B.R. at 182, quoting Rezin v. Barr (In re Barr),

194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996).

## B. Collateral estoppel, also known as issue preclusion, does not apply to the state court's finding that Debtor engaged in conduct that had a tendency to deceive the consumers.

The Commonwealth maintains that the debt at issue in this dispute must be nondischargeable under Section 523(a)(2)(A) because the state court's finding that Debtor engaged in conduct that had a tendency to deceive the consumers is entitled to collateral estoppel effect. The Commonwealth argues that Debtor is therefore barred from relitigating whether the debt was obtained by false pretenses, a false representation, or fraud, as those terms are used in Section 523(a)(2)(A).

Collateral estoppel, also known as issue preclusion, may be used in a Section 523(a) dischargeability proceeding. Grogan v. Garner, 498 U.S. 279, 285 (1991); Viener v. Jacobs (In re Jacobs), 381 B.R. 128, 142 (Bankr. E.D. Pa. 2008). For collateral estoppel to apply, however, the following elements must be met: (1) The issue sought to be precluded must be identical to the issue involved in the prior proceeding; (2) that issue must have been actually litigated in the prior proceeding; (3) a final judgment on the merits of the issue must have been entered in the prior proceeding; (4) the party against whom the doctrine is asserted must have been a party, or in privity with a party, in the prior proceeding, and must have had a full

14

and fair opportunity to litigate the issue in the prior proceeding; and (5) the

determination in the prior proceeding must have been essential to the judgment.

Jean Alexander Cosmetics, Inc. v. L'Oreal, USA, Inc. 458 F.3d 244, 249 (3d Cir.

2006); Cheripka , 1991 WL 276289, at *6; Jacobs, 381 B.R. at 142. "Thus the

doctrine will only prevent relitigation of issues that were actually and necessarily

resolved by the nonbankruptcy court in the prior proceeding." Cheripka, 1991 WL

276289, at *7.

My review of the state court decision shows that the issue before that

court was not identical to the issue before me.  The issue before the state court was

whether Debtor's conduct was deceptive under the Pa. Trade Practices Law, 73

P.S. §201-2(4)(xxi).  The state court's decision, an excerpt of which is quoted

below, establishes that the issue below, unlike the issue whether a debt is

dischargeable under Section 523(a)(2)(A), does not include a finding of intent to

deceive.

When analyzing the question whether Debtor's conduct was "deceptive"

under the Pa. Unfair Trade Practices Law, the state court stated:

> In Pennsylvania, the test for deceptive conduct under Section 201-2(4)(xxi)
> is whether the conduct complained of has a tendency or capacity to deceive.
> (citations omitted).  As a result, the Commonwealth had to establish that the
> act or practices complained of were capable of being interpreted in a
> misleading way.  (citations and footnote omitted).

15

Exhibit BK 50-A, State Court Decision at 29. In its footnote 26, which appeared immediately at the end of the preceding sentence, the state court explained: "This is a lower standard than that which must be proven in order to establish fraudulent conduct, or even negligent misrepresentation." (citation omitted)." Exhibit BK 50-A, State Court Decision at 30, n.26. In other words, no finding of intent to deceive was required for the state court to find Debtor liable for deceptive conduct under the Pa. Unfair Trade Practices Law. Instead, all that was required was a finding that Debtor's conduct had a tendency or capacity to deceive.

To find a debt dischargeable under Section 523(a)(2)(A), however, the creditor must establish, by a preponderance of the evidence, that the debtor acted with intent to deceive. Jundi, 2012 WL 3648013, at *4; McNamara, 2009 WL 2916977, at *5; Antonious, 358 B.R. at 182. This is true whether the creditor is claiming that the debtor committed fraud, made a false representation, or used false pretenses to induce the creditor to incur the debt. Jundi, 2012 WL 3648013, at *4. Furthermore, "[a] false pretense must be fostered 'willfully, knowingly, and by design; it is not the result of inadvertence.'" Antonious, 358 B.R. at 182; see also Strominger v. Giquinto (In re Giquinto), 388 B.R. 152, 174-75 (Bankr. E.D. Pa. 2008).

Because the Commonwealth was not required to establish that Debtor acted

with intent to deceive, or "willfully, knowingly, and by design" to have her found

liable for engaging in deceptive conduct under the Pa. Unfair Trade Practices Law,

the state court never actually and necessarily resolved the question whether Debtor

acted with intent to deceive or "willfully, knowingly, and by design."  The state

court's finding that debtor engaged in deceptive conduct, as that phrase is used in

the Pa. Unfair Trade Practices Law, is therefore not entitled to collateral estoppel

effect in this proceeding.

## C. <u>Res judicata, also known as claim preclusion, does not apply in dischargeability proceedings.</u>

The state court also stated in footnote 25 of its decision: "Although we are

not convinced, and therefore, do not necessarily believe that the evidence warrants

any finding of fraudulent conduct, we need not reach that issue, given our ultimate

conclusion relative to the Commonwealth's claim of deceptive conduct."  Exhibit

BK 50-A, State Court Decision at 29, n.25.  Debtor argues that this portion of the

state court's decision is entitled to res judicata effect and bars the Commonwealth

from relitigating their claim that Debtor engaged in fraudulent conduct.  Debtor's

argument is erroneous, however, because, unlike the doctrine of collateral estoppel,

the doctrine of res judicata, also known as claim preclusion, does not apply in

17

dischargeability proceedings. Felsen, 442 U.S. at 138-39; Cheripka, 1991 WL

276289, at *4. In addition, the state court never found that Debtor did not engage

in fraudulent conduct. Instead, the court stated that while it doubted that Debtor

committed fraud, it did not need to decide the issue because it found that Debtor

engaged in deceptive conduct.

## D. The state court's finding that Debtor's conduct was not intentional or willful is entitled to collateral estoppel effect and the Commonwealth is precluded from relitigating the issue of whether Debtor acted intentionally or willfully.[8]

In addition to restitution, the Commonwealth also sought an award of civil

penalties against Debtor and the other mortgage consultants in the state court

action. To be entitled to civil penalties under the Pa. Unfair Trade Practices Act,

the Commonwealth was required to prove that Debtor and the other mortgage

consultants acted willfully when they sold the wrap mortgages to consumers.

Exhibit BK 50-A, State Court Decision at 47, 73 P.S. §201-8(b).

---

[8]     The state court's finding that Debtor breached a fiduciary duty she owed to her customers
is not relevant to the case before me. The Commonwealth is not seeking to have the debt
declared nondischargeable under 11 U.S.C. §523(a)(4), which is the section of the Bankruptcy
Code that excepts from discharge debts based on fraud or defalcation while acting in a fiduciary
capacity. In addition, the state court specifically found that Debtor's conduct was neither willful
nor intentional, and therefore Debtor's conduct, including the breach of fiduciary duty, is not
actionable under Section 523(a)(2)(A).

The state court, however, refused to award civil penalties, finding that the

conduct of Debtor and the other mortgage consultants was neither willful nor

intentional.

> Beginning with the Mortgage Consultants, we do not believe that the
> evidence warrants the imposition of any civil penalties. In our view, a
> finding of "willful" conduct would require us to find that their conduct was
> "intentional." However, we have found that their conduct was not
> intentional, but was more in the nature of "looking the other way."

Exhibit BK 50-A, State Court Decision at 48.

The question whether Debtor acted "willfully" under the Pa. Unfair Trade

Practices Act when she engaged in deceptive conduct, as that phrase is used

therein, is identical to the issue whether Debtor acted with intent to deceive under

Section 523(a)(2)(A) of the Bankruptcy Code. Because this issue was actually

litigated in the state court, in which both Debtor and the Commonwealth had a full

and fair opportunity to litigate the issue, and because the state entered a final

judgment on the merits of the issue, which was essential to the judgment, collateral

estoppel bars the Commonwealth from relitigating the question whether Debtor

acted with intent to deceive when she sold the wrap mortgages to her customers.

Jean Alexander Cosmetics, 458 F.3d at 249; Cheripka , 1991 WL 276289, at *6;

Jacobs, 381 B.R. at 142. "This issue was actually and necessarily resolved by the

[state court] in the prior proceeding," Cheripka, 1991 WL 276289, at *7. The

Commonwealth is therefore barred from relitigating this issue in this court.

# E. **Alternatively, were the Commonwealth not precluded from relitigating whether Debtor acted with intent to deceive, the Commonwealth failed to prove this essential element during the trial.**

During the four-day trial in this case, Debtor, several of her customers, and an expert witness testified.[9] I found Debtor's testimony very credible, and in many respects, it comported with the testimony of her customers as well. The evidence at trial convinces me that Debtor had no intent to deceive and was not acting willfully, knowingly, and by design when she sold the wrap mortgages to her customers. Antonious, 358 B.R. at 182.

Debtor testified that she did not know about the Ponzi scheme Wesley Snyder was conducting and she did not know that Mr. Snyder was using money he received from one wrap customer to pay the institutional mortgage of another. Notes of Testimony ("N.T."), November 5, 2012 trial at 45.   Debtor was never

---

[9]      In my November 26, 2012 Order, I sustained Debtor's objection to certain questions posed to an expert witness for the Commonwealth.  I determined that the expert could not express an opinion that Debtor should or should not have known a particular fact.  My ruling precluded the expert from testifying whether Debtor should have known that the wrap mortgage monies paid by the consume could not have yielded a sufficiently high return to fund the wrap mortgage program, even if properly invested by the OPFM companies.  My evidentiary ruling rendered the expert witness' testimony not particularly relevant to, or useful in resolving, the critical issue before me -- whether Debtor acted with intent to deceive when she sold the wrap mortgages to her customers.

aware of the value of the OPFM companies' assets, or that the OPFM companies were losing money. Id. at 70-71.[10]  She also did not know how Mr. Snyder invested the OPFM companies' assets. Only Mr. Snyder had access to this information. Id. at 111-12.

Debtor also testified that she told her customers that the wrap mortgage was a unique product that was not suitable for everyone. Id. at 53-54. If customers asked about the risk of the wrap mortgage product, she explained that it had no grace period. If a customer paid late, there would be a reduction in the interest rate for that month. She also explained to many of her customers that if the OPFM companies filed bankruptcy, they would "get the senior mortgage back and they would get [what was left of the wrap] payments back." Id. at 47, 50. She never told her customers that they would lose money if the OPFM companies filed bankruptcy because she "never thought that money would not be there." Id. at 50. Debtor thought that "if something happened to the company, [the consumer] would get what was left of the wrap money back and they would get the mortgage back and they'd have to pay it." Id. at 50-51.

---

[10] Debtor testified that she was not in the office very much during 2007 and did not attend many staff meetings during this time period because she was spending time with her terminally ill mother, who was in a hospital and then a nursing home. N.T. November 5, 2012 trial at 107. She further testified that she never realized that the OPFM companies would not have the money to pay the consumers' institutional mortgages until she received a phone call in September 2007 advising her that the OPFM companies were closing their doors. Id. at 110.

Debtor also testified that she thought the information contained in the

brochures and packets that OPFM gave to consumers was accurate and that she

never intended to harm her customers. Id. at 71, 156. She testified that she:

> believe[s] that the wrap program is a good program. It was good for people
> who didn't want to invest in the market. This way they could at least get a
> lower interest rate and have lower payments on their mortgage. As far as
> loan participations, it was – I felt it was good for the retired people because
> they got – they got an interest rate that was the same every month. It wasn't
> a fluctuating interest rate. And that was something that had been going on
> for years. And they – I believed it would continue to go on.

Id. at 157.

At one time, Debtor and her husband had a wrap mortgage with the OPFM

companies. They also had a loan participation agreement with the OPFM

companies, as did many of their relatives, all of whom collectively lost over

$500,000 when OPFM failed. Id. at 161.[11]

Based on this evidence, I find that the Commonwealth failed to meet its

burden of proving that Debtor acted with intent to deceive her customers, or

willfully, knowingly, and by design, when she sold them the wrap mortgages.

Instead, I find, Debtor honestly believed in the integrity of the products she was

---

[11]    The state court found that Debtor and her husband lost approximately $30,000 from their
investment in the OPFM companies' loan participation agreement and that the losses of their
relatives from their investments in the loan participation agreements totaled in excess of
$490,000. Exhibit BK 50-A at 42-43.

selling.  This is evidenced by the facts that (1) Debtor and her husband purchased a wrap mortgage from the OPFM companies, (2) Debtor and her husband entered into a loan participation agreement with the OPFM companies, and (3) Debtor sold loan participation agreements to her relatives, all of whom lost substantial amounts of money.  Because the Commonwealth failed to meet its burden of proving that Debtor acted with intent to deceive when she sold the wrap mortgages to her customers, the debt is dischargeable under 11 U.S.C. §523(a)(2)(A). Jundi,  2012 WL 3648013, at *4; McNamara, 2009 WL 2916977, at *5); Antonious, 358 B.R. at 182.

# IV. CONCLUSION

For the reasons outlined above, I find and conclude that the state court's findings are not entitled to collateral estoppel effect in this proceeding.   The state court decided that Debtor violated the Pa. Unfair Trade Practices Act, but that issue is not identical to the issues or elements that are presently before me.  Debtor may have engaged in conduct that had a tendency or capacity to deceive, but that does not translate into establishing the Commonwealth's case in this adversary proceeding.   Unlike the Section 523(a)(2)(A) cause of action before me, the cause of action before the state court did not require a finding that Debtor acted with intent to deceive.  Debtor is therefore not precluded from litigating whether she actually acted with intent to deceive when she sold the wrap mortgages to her customers.

On the other hand, I find and conclude that the state court's refusal to impose civil penalites establishes that Debtor was neither willful nor intentional in her actions.  The state court finding that Debtor's conduct was neither intentional nor willful is entitled to collateral estoppel effect.  In this context, the issue before the state court -- whether Debtor acted with intent to deceive when she sold the wrap mortgages to her customers -- is identical to the issue before me.  The Commonwealth is therefore precluded from relitigating this issue.

Alternatively, even if collateral estoppel does not preclude the

Commonwealth from relitigating whether Debtor acted with intent to deceive when

she sold the wrap mortgages to her customers, the evidence presented during the

four-day trial held before me establishes that the Commonwealth failed to meet its

burden of proof on this issue.  The debt is therefore dischargeable under Section

523(a)(2)(A).

An appropriate Order follows.

Date:  December 2, 2013

BY THE COURT

Richard  E. Fehling
United States Bankruptcy Judge

25